UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**PRISCILLA LEWIS,**

                    **Plaintiff,**

**vs.**                                                    **Case No. 8:10-cv-1182-T-27EAJ**

**FLORIDA DEFAULT LAW GROUP, P.L.,**

                    **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 12).  Upon consideration, the motion is **GRANTED**.

## Introduction

This case involves a claim for employment discrimination under the Americans with Disabilities Act, 42 U.S.C. § 1201, *et seq.* ("ADA").[1]  Plaintiff, Priscilla Lewis ("Lewis"), claims that Defendant, Florida Default Law Group, P.L. ("Florida Default"), discriminated against her based on an actual or perceived disability (*i.e.*, H1N1/Swine Flu).[2]  Specifically, Lewis alleges that Florida Default terminated her because (i) she had the H1N1 virus and/or (ii) Florida Default perceived she had the H1N1 virus.  *See* Complaint (Dkt. 2), ¶ 28.  Florida Default argues that Lewis was neither disabled nor regarded as disabled under the ADA and that her termination was based on a legitimate nondiscriminatory reason.

---

[1] The parties stipulate that since the alleged discriminatory action occurred in November 2009, the ADA as amended by the Americans with Disabilities Amendments Act ("ADAA") applies to Plaintiff's claims.

[2] During her deposition, Lewis confirmed that H1N1/Swine Flu was the only disability she has alleged in this lawsuit.  Deposition of Priscilla Lewis (Dkt. 13) ("Pl. Dep."), pp. 55-56.

The undisputed evidence reveals that Lewis was never diagnosed has having the H1N1 virus or that she otherwise suffered an actual disability within the meaning of the ADA. In addition, Lewis is unable to establish that she had a perceived disability under the "regarded as" prong of the ADA definition because the undisputed evidence reveals that her impairment was both transitory and minor. As Lewis cannot demonstrate that she has a "disability" as defined by the ADA, Florida Default is entitled to summary judgment.

## Background

Lewis was employed by Florida Default from January 5, 2009, until her termination on November 4, 2009. Lewis was originally hired as a Foreclosure Supervisor in the Foreclosure Operations Department of Florida Default. Affidavit of Priscilla Lewis (Dkt. 28-19) ("Pl. Aff."), ¶ 2. On or about March 30, 2009, Lewis agreed to accept a lower-level position of Foreclosure Specialist. Pl. Aff., ¶ 2.[3]

In her role as Foreclosure Specialist, Lewis was assigned the task of preparing default packages. Deposition of Heather Newman (Dkt. 15) ("Newman Dep."), p. 27. Florida Default required that Lewis submit her completed default packages to a quality control analyst who reviewed the packages for errors. *Id.* Lewis never had three days of error free packages as required to exit quality control supervision. Newman Dep., p. 28, 53-54; Deposition of Mary Dixon (Dkt. 19) ("Dixon Dep."), pp. 21-24; *see* Declaration of Mary Dixon (Dkt. 19) ("Dixon Dec."), ¶ 3.

On October 28, 2009, Lewis emailed her direct supervisor, Heather Newman, to inform her that Lewis was going to need to leave work early the following day for a doctor's appointment.

---

[3] Lewis contends that she voluntarily accepted the position of Foreclosure Specialist, while Florida Default contends that due her to poor performance as Foreclosure Supervisor she was essentially demoted to the role of Foreclosure Specialist. Deposition of Jan Duke (Dkt. 14) ("Duke Dep."), p. 5; Declaration of Cindy Reinhard (Dkt. 20) ("Reinhard Dec."), ¶ 5.

Newman Dep., Ex. 2, Pl. Dep., p. 58; Plaintiff's Notice of Filing (Dkt. 28) ("Pl. NOF."), Ex. 9. Newman approved Lewis' request, but reminded her that she had already missed six days of work over the past three months and advised Lewis to avoid what "could be considered excessive absenteeism." *Id.*; *see* Newman Dep., p. 68.[4]

Rather than wait until the next day, Lewis left work on the afternoon of October 28, 2009, and went to the emergency room at St. Anthony's Hospital. Pl. Dep., p. 58. The attending physician, Dr. Brian Cotter, described Lewis' symptoms as "low grade temperature, cough, yellow sputum, diarrhea, sore throat, malaise, left lower quadrant abdominal pain, history of diverticulosis." Deposition of Dr. Brian Cotter (Dkt. 16) ("Cotter Dep."), p. 8. Dr. Cotter diagnosed Lewis with Influenza A, which he described as "seasonal flu." *Id.* Although the H1N1 virus is within the classes of viruses included under the label of Influenza A, the tests performed by Dr. Cotter did not delineate between the specific strains of Influenza A and Dr. Cotter at no time diagnosed Lewis as having the H1N1 virus. *Id.* at pp. 13-14. Dr. Cotter provided Lewis with a medical note allowing her to return to work on November 2, 2009, provided that she did not have a fever. Plaintiff's Interrogatory Answers (Dkt. 21-1) ("Pl. Rog. Ans."), Attachment #200008. Lewis was discharged from the emergency room in "extremely stable" and good condition (*i.e.*, she was not admitted). Cotter Dep., p. 11, Ex. 2.[5]

Despite Dr. Cotter's undisputed testimony that he never diagnosed Lewis as having the H1N1 virus, Lewis apparently ***understood*** that she was diagnosed as having the H1N1 virus. Plaintiff's

---

[4] The record reveals that Lewis had substantial attendance issues between August 11, 2009, and October 28, 2009. *See, e.g.*, Newman Dep., pp. 67-68; Reinhard Dec., ¶ 6. Florida Default first counseled Lewis with respect to her absenteeism on or about October 5, 2009. Newman Dep., Ex. 8.

[5] In contrast, Lewis alleges in the Complaint that she "phoned [her supervisor] from the hospital to advise her that the doctors wanted to keep [her] overnight and that [she] would not be able to work the next day." Complaint, ¶ 16.

Response to Defendant's Motion for Summary Judgment (Dkt. 27) ("Plaintiff's Response"), p.5; Pl. Dep., pp. 56-58, 60-61; Pl. Aff., ¶ 3.

Lewis did not go to work on October 29, 2009, and October 30, 2009, but did call her supervisor each day to inform her that she would not be working.  Newman Dep., p. 46.  On Saturday, October 31, 2009, Lewis sent an "urgent and confidential" email to Jan Duke (Florida Default's Chief Human Resource Officer) and Bill Casale (Florida Default's Chief Operating Officer) informing them that she had gone to the emergency room on October 27, 2009, and was "diagnosed with Influenza A (Swine Flu) and other underlying issues."  Pl. Dep., Ex. 15; Pl. NOF, Ex. 11.  In the email, Lewis indicated that she was "highly contagious," but had a doctor note indicating that she could return to work on Monday.  *Id.*  While Lewis did not "want to give [the Swine Flu] to anyone," she stated that she needed "to return to work in fear that [she] may [be] penalized and loose [sic] [her] job as well as the financial hardship."  *Id.*  Lewis noted that "[r]eturning to work will be hard for me physically" and requested that she be allowed to work from home.  *Id.*[6]

Duke and Casale responded to Lewis' email suggesting that Lewis should focus on her own well being and potentially get a second opinion with respect to her purported H1N1 diagnosis.  *Id.* Duke also indicated that during the past few months several Florida Default employees had been diagnosed with the H1N1 virus and in each instance they were encouraged to stay home and rest until they obtained a doctor's permission to return to work.  *Id.*  Duke noted that none of those

---

[6] Lewis was not eligible to work from home because she remained in quality control.  Dixon Dec., ¶¶ 4-5.

employees worked from home while ill.  *Id.*[7]  Duke stated she was unable to respond to Lewis'

concern of being disciplined for her current absence, because she needed "to review other factors

concerning [Lewis'] previous absences such as frequency, planned vs. unplanned, doctor's notes,

etc."  *Id.*  Duke further noted that "for this 'specific' absence/illness" the company did not want her

"to be in the office working if [her] doctor has indicated [that she was] highly contagious."  *Id.*

On November 3, 2009,[8] Lewis visited her primary care physician, Dr. Crist, in connection

with her continuing symptoms.  Pl. Dep., p. 60; Deposition of Dr. Charles J. Crist (Dkt. 17) ("Crist

Dep."), p. 10.  This was the first time she saw Dr. Crist in connection with these symptoms.  *Id.*  Dr.

Crist did not perform any tests to determine whether Lewis had the H1N1 virus as opposed to

seasonal flu.  *Id.* at p. 12.[9]  Crist provided Lewis with a medical note stating that she was medically

excused from work from October 28, 2009, to November 3, 2009.  Crist Dep., Ex. 4; Pl. NOF 12.

Dr. Crist stated that he would not have given Lewis a medical note allowing her to return to work

if she was "still highly contagious."  Crist Dep., p. 20.

Lewis claims that she was mostly bedridden during the time she "was infected with H1N1,"

was physically drained, dizzy, had shortness of breath, was vomiting, and had diarrhea.  Pl. Aff., ¶ 4.

As a result, she was unable to take care of her children, cook, run errands, and perform tasks around

her house such as laundry and dishes.  *Id.*  Lewis had a friend come to her house to take care of her

---

[7] Lewis nonetheless contends that other individuals with the H1N1 virus were allowed to work at home during the time they were infected.  *See* Pl. Dep., pp. 68-69.  This contention contradicts, rather than supports, her claim that Florida Default discriminated against her because she had, or was perceived as having, the H1N1 virus.

[8] Despite being instructed by Dr. Cotter to follow up with her primary care physician on October 29, 2011, Lewis waited more than four days before seeing Dr. Crist on November 3, 2011.  Crist Dep., 9.

[9] Dr. Crist understood that Lewis had the H1N1 virus, but this understanding was based on Lewis' statements and information he received from the hospital indicating that she tested "positive" for Influenza A.  Crist Dep., p. 12.  Upon reviewing the test results at his deposition, Dr. Crist acknowledged that the test did not distinguish between different strains of Influenza A.  *Id.* at p. 18.

and to help take care of her son.  Pl. Dep., pp. 92-93.  While recovering, Lewis also had bronchitis which made it difficult for her to breathe, eat, and swallow.  Pl. Aff., ¶ 5.[10]

When Lewis returned to work on November 4, 2009, she was terminated, in part, because of her previous absenteeism combined with the recent four day absence.  Pl. Dep., pp. 65-66.[11] Newman testified that on the day before Lewis was terminated: "We went through all of her missed time, calculated it, calculated it up, and it was excessive.  And at that point, it was just too much." Newman Dep., pp. 48-49, 56-57; *see* Duke Dep., p. 16.  Thus, Lewis argues she was terminated because she had or was perceived as having been infected with the H1N1 virus.  Pl. Dep., pp. 69-70.

## Standard

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

---

[10] The bronchitis was resolved within two weeks of her initial visit to Dr. Crist.  Crist Dep., pp. 37-39.

[11] The record contains substantial evidence indicating that Lewis' poor performance was also a factor in her termination.  *See, e.g.*, Dixon Dep., p. 22; Newman Dep., p. 40-43.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id.*

## Discussion

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009). An individual may establish that they are "disabled" within the meaning of the ADA by demonstrating: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) that they were "regarded as" having such an impairment. 42 U.S.C. § 12102(1) (2009). As discussed below, Lewis is not disabled under the ADA because (i) she did not have an actual disability and (ii) could not have been "regarded as" disabled.[12]

---

[12] Lewis does not attempt to establish "a record of impairment."

7

***Actual Disability***

An individual seeking to establish that they had an actual disability within the meaning of the ADA must show that they had a physical or mental impairment that substantially limits one or more major life activities[13] of such individual.  42 U.S.C. § 12102(1)(A).

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most of the population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.   Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(ii).  "The determination of whether an impairment substantially limits a major life activity requires an individual assessment."  29 C.F.R. § 1630.2(j)(iv).[14]

The ADAA made clear that an impairment lasting or expected to last fewer than six months can be substantially limiting and qualify as a disability under the ADA.  *See* 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.").[15]  While an impairment need not last for more than six months to be considered substantially limiting, "[t]he duration of an impairment

---

[13] A "major life activity" includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working" as well as "the operation of a major bodily function." 29 C.F.R. § 1630.2(i).  "In determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(i)(2).

[14] "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.  'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630(j)(i).

[15] Prior to the ADAA, the majority, if not all, courts to address the issue found that conditions ranging from pneumonia to the seasonal flu did not fall within the statutory definition of the ADA. *See, e.g.*, *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002) (determining that pneumonia is temporary and does not meet the statutory definition); *Halperin v. Abacus Tech. Corp*, 128 F.3d 191, 200 (4th Cir. 1997) (holding that infectious diseases that temporarily affect a person's ability to work are not afforded the protection of the ADA); *Procopio v. Castrol Indus. N. Am., Inc.*, No. 96-5234, 1996 WL 684244, at *1 (E.D. Pa. Nov. 21, 1996) (holding that "brief flue-like" symptoms do not meet the statutory definition of disability).

is one factor that is relevant in determining whether the impairment substantially limits a major life activity. ***Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe***." 29 C.F.R. Pt. 1630, App'x (citing Joint Hoyer-Sensenbrenner Statement, p. 5) (emphasis added).[16]   Lewis' impairments, which undisputedly were short-term in duration, were not sufficiently severe so as constitute an actual disability under the ADA. *Cf. Cohen v. CHLN, Inc.*, Civil Action No. 10-00514, 2011 WL 2713737, at *8 (E.D. Pa. 2011) (concluding that, unlike the common cold or flu, back and leg pain that began four months prior to termination and could extend indefinitely into the future might constitute a disability under the ADA).

Lewis' argues that the H1N1 virus should be viewed as giving rise to an impairment substantially limiting a major life activity because, if untreated, it could lead to serious complications[17] or death.   In support of this argument, Lewis relies on an ADAA amendment providing that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of [certain] mitigating measures." 42 U.S.C. § 1202(4)(E)(i).[18]   This provision, however, applies to efforts to mitigate the symptoms of a an impairment, not treatment that alleviates a condition in its entirety. *Cf.* 29 C.F.R. Pt. 1630, App'x ("For an example, someone who began taking medication for hypertension before

---

[16] Although the Equal Employment Opportunity Commission's (the "EEOC" or the "Commission") administrative interpretations are not binding, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

[17] For example, if Lewis was not treated for her secondary bacterial infection, bronchitis, it could have progressed to the more serious condition of pneumonia.  Crist Dep., p. 31.

[18] This provision was "intended to eliminate the catch-22 that exist[ed] ... where individuals who are subjected to discrimination on their disabilities [we]re frequently unable to invoke the ADA's protections because they [we]re not considered with disabilities when the effects of their medication ... [was] considered." 29 C.F.R. Pt. 1630, App'x (citing Joint Hoyer-Sensenbrenner Statement, p. 2).

experiencing substantial limitations related to the impairment would still be an individual with a disability if, without the medication, he or she would now be substantially limited in functions of the cardiovascular or circulatory system.").[19]

Lewis also argues that her impairment, while of short duration, was a disability relying on the fact that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). The flu (whether seasonal or H1N1), however, is different from the more permanent – albeit episodic – conditions like cancer, epilepsy, asthma, bipolar disorder, schizophrenia, hypertension, diabetes and post-traumatic stress disorder that this provision was intended to include within the definition of disability. *See* 29 C.F.R. Pt. 1630, App'x (citing Joint Hoyer-Sensenbrenner Statement, pp. 2-3; 2008 House Judiciary Committee Report, pp. 19-20).

Assuming that the symptoms experienced by Lewis (*i.e.,* being bedridden, physically drained, and dizzy, having shortness of breath, vomiting, and diarrhea) were "physical impairments," Lewis has failed to show that these temporary impairments "substantially limited" any major life activity given the extremely short duration that she suffered from those impairments. To be certain, taking care of one's children, cooking, running errands, and performing tasks around the house such as laundry and dishes, may in most circumstances be "major life activities," but the fact that Lewis could not perform those functions for a period of one to two weeks does not mean her symptoms

---

[19] If Lewis' argument were accepted it would require that almost any infection or injury, regardless of its actual impact, be treated as a covered disability under the ADA. That is, virtually any minor injury could lead to long term disability or death if not properly treated. For example, failure to treat a wound may result in a serious life-threatening infection (or in severe instances an individual bleeding to death). Similarly, failure to properly treat a broken bone may result in permanent disfigurement and diminished physical capacity. Simply because a condition or injury may lead to a qualifying disability does not mean that the original condition or injury is in and of itself a qualifying disability.

"substantially limited" those activities.[20]  As such, Lewis did not have an "actual" disability under

the ADA.[21]  Because Lewis did not have an "actual" disability within the meaning of the ADA,

Lewis was not entitled to a reasonable accommodation (*i.e.*, the ability to work from home during

her illness).   42 U.S.C. § 12112(5)(A); *see, e.g., Larkin v. Methacton School Dist.*,

773 F.Supp.2d 508, 530-31 (E.D. Pa. 2011).

### *"Regarded As" Having an Impairment*

An individual seeking to establish that they were disabled under the "regarded as" prong of

the definition[22] must establish "that the individual has been subjected to an action prohibited by the

ADA as amended because of an actual or perceived impairment that is not both 'transitory and

minor.'"  29 C.F.R. § 1630.2(g)(iii).  A transitory impairment is an impairment with an actual or

expected duration of 6 months or less.  42 U.S.C. § 12102(3)(B).  In this case, it is undisputed that

---

[20] Lewis acknowledged that upon her return to work (and at the time of her termination) on November 4, 2009 she was no longer "battling" the H1N1 virus and could have performed all of the essential functions of her job without any accommodation.  Pl. Aff., ¶6; Pl. Dep., pp. 67-69.

[21] This outcome is consistent with the EEOC's determination that, even post-ADAA, swine flu, or the H1N1 virus, is not likely to be considered a disability under the Americans With Disabilities Act.  *See* EEOC: Pandemic Preparedness in the Workplace and the Americans With Disabilities Act (Oct. 9, 2009) (Dkt. 12-4) (previously available at   http://www.eeoc.gov/facts/pandemic_flu.html) (suggesting pandemic influenza like seasonal influenza or spring/summer 2009 H1N1 is not a qualified disability under the ADA); Congressional Research Service Report, "The Americans With Disabilities Act: Employment Issues and the 2009 Influenza Pandemic" (R40866).  Similarly, a draft of the proposed regulation implementing the ADAA included examples of impairments that "are not usually disabilities," including "[t]emporary, non-chronic impairments of short duration with little or no residual effects (such as the common cold, seasonal or common influenza, a sprained joint, minor and non-chronic gastrointestinal disorders, or a broken bone that is expected to heal completely).  76 FR 48431, at *48442 (proposed § 1630.2(j)(8)).  The Commission deleted this section from the final regulation because of "the confusion it presented" in light of the requirement that the determination of disability is an individualized assessment.  76 FR 16978, at *16984.

[22] The "regarded as" prong was intended to express Congress's understanding that "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities are often just as disabling as actual impairments and [its] corresponding desire to prohibit discrimination founded on such perceptions."  29 C.F.R. Pt. 1630, App'x (quoting 2008 Senate Statement of Managers, p. 9; House Judiciary Committee Report, p. 17).

Lewis' actual or perceived impairment was transitory.  Lewis concedes as much, *see* Plaintiff's

Response, p. 15, but argues that the H1N1 virus was in no way minor.[23]

Lewis contends that (i) the illness itself is a serious and potentially life threatening health

condition and (ii) Florida Default viewed the illness (and the fact that it was contagious) as a serious

health condition.[24]   The determination of "transitory and minor" is made objectively.

29 C.F.R. § 1630.15(f)(2).  That is, "[t]he relevant inquiry is whether the actual or perceived

impairment on which the employer's action was based is objectively 'transitory and minor,' not

whether the employer claims it subjectively believed the impairment was transitory and minor."

29 C.F.R. Pt. 1630, App'x (providing examples and indicating that neither bipolar disorder nor HIV

infection are transitory and minor).

The "transitory and minor" exception to the "regarded as prong" focuses on the perceived

impairment itself and not the condition giving rise to such impairment.  As a result, the fact that

Florida Default and the healthcare community may have viewed a potential H1N1 pandemic[25] as

---

[23] There appears to be some question whether the "transitory and minor" phrase should be read conjunctively and/or whether conditions that are transitory are also, in most cases, minor.  *See White v. Interstate Distributor Co.*, No. 11-5063, 2011 WL 3677976, *4 (6th Cir. Aug. 23, 2011) (leg fracture was transitory and, thus, plaintiff could not establish a "regarded as disabled" claim); *Dugay II v. Complete Skycap Services, Inc.*, No. CV-10-2404-PHX-GMS, 2011 WL 3159171, *4 (D. Az. July 26, 2011) (neck and back injuries suffered in car accident were transitory and, thus, even though plaintiff suffered from a physical impairment he could not establish a "regarded as disabled" claim); *see also Cohen v. CHLN, Inc.*, Civil Action No. 10-00514, 2011 WL 2713737, at *8 (E.D. Pa. 2011) (defendant's knowledge that plaintiff may be unable to work for a short period of time while recovering from surgery did not give rise to a claim that defendant regarded plaintiff as disabled).  In this case, the undisputed evidence demonstrates that Lewis' actual or perceived impairment was both transitory and minor.

[24] To establish that Florida Default viewed the H1N1 virus as serious, Lewis relies on two emails that Florida Default sent to employees in response to a Public Health Emergency Bulletin issued by the Centers for Disease Control ("CDC") that warned hospitals of a "potential pandemic" involving the H1N1 virus.  Pl. Dep., Ex. 13; Pl. NOF, Ex.5.  The emails told employees that if they were "sick and experiencing any symptoms that could potentially be associated with" the H1N1 virus, they should "stay home and avoid infecting" other co-workers.  *Id.*

[25] " Pandemic" does not refer to the symptoms of the H1N1 virus, but rather the number of H1N1 cases.  Cotter Dep., p. 17.

quite serious is not relevant to a determination of whether Florida Default perceived Lewis' herself as seriously impaired by the H1N1 virus.[26]

According to the CDC, the symptoms of the 2009 H1N1 virus included fever, cough, sore throat, runny or stuffy nose, body aches, headache, chills, fatigue and, for some, vomiting and diarrhea. Pl. NOF, Ex., 2. The duration of Influenza A can run from five to fifteen days and most patients with Influenza A "recover rather well." Cotter Dep., p. 12. These short-term symptoms (*i.e.*, impairments) are specifically the type of impairments that the "transitory and minor" exception was intended to cover. *See* 2008 House Judiciary Committee Report, p. 18 (explaining that "absent this exception, the third prong of the definition would have covered individuals who are regarded as having common ailments like the cold or flu, and this exception responds to concerns raised by members of the business community regarding potential abuse of this provision and misapplication of resources on individuals with minor ailments that last only a short period of time").

During a hearing on the motion for summary judgment, Plaintiff's counsel was unable to provide concrete differences between the symptomatology of the seasonal flu virus and the H1N1 virus. Similarly, Dr. Crist testified that H1N1 seemed just like "just ordinary flu" most of the time and that complications among healthy adults is "unusual." Crist Dep., pp. 28-29. Dr. Crist stated that his office made no plans to handle individuals diagnosed with the H1N1 virus differently from

---

[26] Accepting Lewis' argument with regard to the "minor" part of the exception (*i.e.*, that the potential severity of the pandemic demonstrates that the H1N1 virus was not a minor impairment), Lewis could also have argued that because the potential H1N1 pandemic was anticipated to last more than six months her claim should not fall within the "transitory" part of the exception.

the way he handled the flu in previous years (except that there was some concern of an increased volume of case).  Crist Dep., p. 36.[27]

Even under a subjective standard, the undisputed evidence reveals that although Florida Default took the threat of an H1N1 pandemic seriously, it did not view Lewis' impairment (nor the symptoms of H1N1 infection in general) as anything more than transitory and minor.[28]  In fact, the record demonstrates that Florida Default questioned whether Lewis even had the H1N1 virus.  Duke who approved Lewis' termination, testified that until this day she is unaware whether Lewis actually had the H1N1 virus.  Duke Dep., p.15.  Similarly,  Casale testified that he had doubts as to whether Lewis was actually infected with the H1N1 virus.  Deposition of Bill Casale (Dkt. 28-21), pp. 17-20.  The record also reveals that the individuals responsible for Lewis' termination were unaware that Lewis claimed to have the H1N1 virus until after Lewis was terminated.  Newman Dep., pp. 45, 65-66, 70, 87, 89-90; Dixon Dep., pp. 19-20, 29-31.  Tellingly, none of the employees that Florida Default recognized as having the H1N1 virus were terminated.  Pl. Dep., p. 68-69.

As the undisputed evidence demonstrates that Lewis' actual or perceived impairment was both transitory and minor, Lewis has failed to establish that she was disabled under the "regarded as" prong of the ADA definition of disability.[29]

---

[27] Dr. Cotter testified that he considered the flu to be "a serious illness."  *Id.*  This statement, standing alone (*i.e.*, without any evidence as to the objective seriousness of the impairment arising from the flu), is insufficient to bring Lewis' actual or perceived impairment outside the "transitory and minor" exception to the "regarded as" prong of the ADA's definition of disability.

[28] For example, after experiencing the symptoms of the H1N1 virus firsthand through her own children's infection, Duke "did not believe it to be one of the most seriousness illnesses that [she] had been exposed to in [her] own life."  Duke Dep., pp. 17-18.

[29] To the extent that Lewis claims that Florida Default failed to provide a reasonable accommodation, there is no requirement that an employer provide a reasonable accommodation when disability is based on the "regarded as" prong of the definition.  42 U.S.C. § 12201(h); 29 C.F.R. § 1630.2(o)(4).

## Conclusion

In conclusion, even viewing the entirety of the record in a light most favorable to Lewis, there are no genuine issues of material fact as to her claim of discrimination.[30] While the Court recognizes that the ADAA was intended to expand the scope of the ADA to protect individuals that were not previously covered,[31] the result in this case is not inconsistent with that intent. *See* EEOC Final Regulatory Impact Analysis (RIN 3046-AA5), 76 FR 16978, at *16993 (recognizing that most of the people that will benefit from the amended law and regulations are "people with conditions like epilepsy, diabetes, cancer, HIV infection, and a range of mental disabilities").

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 12) is **GRANTED**. All pending motions, if any, are **DENIED** as moot. The Clerk is directed to **ENTER** judgment in favor of Defendant and **CLOSE** this case.

**DONE AND ORDERED** in chambers this ___15th___ day of September, 2011.

> JAMES D. WHITTEMORE
> United States District Judge

Copies to: Counsel of Record

---

[30] Even if Lewis could establish that she was disabled within the meaning of the ADA, she would have difficulty demonstrating that she was otherwise qualified to perform the job due to the "highly contagious" nature of her condition. *See* 29 C.F.R. § 1630.2(r) (recognizing that employers may require as a qualification standard that an individual not pose a direct threat to the health or safety of himself/herself or others); *see also Basden v. Professional Transp., Inc.*, Cause No. 3:10-cv-02-WTL-WGH, 2011 WL 2940726, at *5 (S.D. Ind. July 19, 2011) ("In most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability.") (citations omitted)).

[31] In passing the ADAA, Congress expressed its concern that "lower court cases have too often turned solely on the question of whether the plaintiff is an individual with a disability rather than the merits of discrimination claims." Senate Statement of the Managers to Accompany S. 3406, p. 4. As a result, the ADAA and enacting regulations make clear that the "primary object of attention in cases brought under the ADA should be whether entities covered under the ADA should be whether entities covered under the ADA have complied with their obligations, not – whether the individual meets the definition of disability." 29 C.F.R. Pt. 1630, App'x (citing ADAA Section 2(b)(5)); *see also* 29 C.F.R. §§ 1630.01, 1630.2(j)(iii).